## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| BENJAMIN LEWIS AMERSON, JR. and RHONDA AMERSON | : : : | |
| Plaintiffs, | : | Case No.: |
| | : | |
| v. | : : | **COMPLAINT AND DEMAND FOR JURY TRIAL** |
| Abbott Laboratories, Inc., AbbVie Inc., Auxilium Pharmaceuticals, Inc., and Pfizer, Inc. | : : : : | |
| JANE DOE DISTRIBUTORS (1-50), JOHN DOE DRUG COMPANY DEFENDANTS (1-50), JANE DOE DRUG DISTRIBUTOR DEFENDANTS (1-50), JIM DOE DOE HEALTH CARE PROVIDERS (1-50), and JILL DOE (1-50), | : : : : : : : : | |
| Defendants. | : | |

Plaintiffs, Benjamin Lewis Amerson, Jr. and Rhonda Amerson ("Plaintiffs"), by and through their undersigned Counsel, and for his Complaint against the Defendants Abbot Laboratories, Inc., AbbVie Inc., Auxilium Pharmaceuticals, Inc., and Pfizer, Inc. (collectively "Defendants"), alleges as follows:

### NATURE OF THE CASE

1.      This is an action for damages suffered by Plaintiffs as a direct and proximate result of Defendants' wrongful conduct in connection with the development, design, testing, labeling, packaging, promoting, advertising, marketing, distribution, and selling of Defendants' prescription medications  AndroGel, Testopel and Depo-Testosterone.

1

2.     This case involves the prescription drugs AndroGel, Testopel, and Depo-Testosterone ("testosterone"), which are manufactured, sold, distributed and promoted by Defendants as testosterone replacement therapies.

3.     Defendants misrepresented that testosterone is a safe and effective treatment for hypogonadism or "low testosterone," when in fact these drugs cause serious medical problems, including life threatening cardiac events, strokes, and thrombolytic events.

4.     Defendants engaged in aggressive, award-winning direct-to-consumer and physician marketing and advertising campaigns for testosterone. Further, Defendants engaged in an aggressive unbranded "disease awareness" campaign to alert men that they might be suffering from "low T."

5.     As a result, diagnoses of Low T and prescriptions for testosterone replacement therapies have increased exponentially. For example:

   a.   Defendants Abbott Laboratories, Inc. and AbbVie Inc.'s sales of AndroGel have increased to over $1.37 billion per year;

   b.   Defendant Auxilium Pharmaceutical Inc.'s sales of Testopel have increased to over $58 million per year; and

   c.   Defendant Pfizer, Inc.'s sales of Depo-Testosterone have increased to over $130 million per year.

6.     However, consumers of testosterone were misled as to the drug's safety and efficacy, and as a result have suffered injuries including life-threatening cardiac events, strokes, and thrombolytic events.

## JURISDICTION

7.      This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a) because Plaintiff and Defendants are citizens of different States and the amount in controversy exceeds $75,000 exclusive of interest and costs.

8.      Venue in this action properly lies in this judicial district pursuant to 28 U.S.C. § 1391(a), as a substantial number of the events, actions or omissions giving rise to Plaintiff's claims occurred in this district. At all times material hereto, Defendants conducted substantial business in this district.

## PARTIES

9.      Plaintiffs, Benjamin Lewis Amerson, Jr. and Rhonda Amerson, are citizens of the state of Georgia, and residents of Bibb County, Georgia.

10.     Upon information and belief, Defendant Abbott Laboratories, Inc., a manufacturer of AndroGel, is a corporation organized and existing under the laws of Illinois and maintains its principal place of business at 100 Abbott Park Road, Abbott Park, Illinois 60064-3500. Abbott Laboratories, Inc. has conducted business and derived substantial revenue from within the States of Georgia and Pennsylvania.

11.     Upon information and belief, Defendant AbbVie Inc., a manufacturer of AndroGel, is a corporation organized and existing under the laws of Delaware with its principal place of business at 1 North Waukegan Road, North Chicago, Illinois 60064. AbbVie Inc. has conducted business and derived substantial revenue from within the States of Georgia and Pennsylvania.

12.     By way of background, Unimed Pharmaceuticals Inc. originally developed AndroGel and sought FDA approval in 1999. Before the drug was approved by the FDA in

3

2000, Solvay Pharmaceuticals Inc. acquired Unimed Pharmaceuticals, Inc. and subsequently brought AndroGel to market.  In 2010, Defendant Abbott Laboratories, Inc. acquired Solvay's pharmaceutical division, which included AndroGel.  Then, in 2013, Abbott created AbbVie, a company composed of Abbott's former proprietary pharmaceutical business, which included AndroGel.

13.     Upon information and belief, Defendant Pfizer Inc., the manufacturer of Depo-Testosterone, is a corporation organized and existing under the laws of Delaware with its principal place of business at 235 East 42nd Street, New York, New York 10017. Pfizer Inc. has conducted business and derived substantial revenue from within the States of Georgia and Pennsylvania.

14.     By way of background, Pharmacia and Upjohn Company originally developed Depo-Testosterone and gained FDA approval in 1979.   In 2003, Pharmacia and Upjohn Company merged with Pfizer, Inc.

15.     Upon information and belief, Defendant Auxilium Pharmaceuticals, Inc., the manufacturer of Testopel, is a Delaware corporation which has its principal place of business at 640 Lee Road, Chesterbrook, Pennsylvania 19087. Auxilium Pharmaceuticals, Inc. has conducted business and derived substantial revenue from within the States of Georgia and Pennsylvania.

16.     By way of background, Testopel was initially developed by Bartor Pharmacal Company, Inc., and was approved by the FDA in 1972.  In 2008, Slate Pharmaceuticals, Inc. began marketing Testopel.  Actient Holdings, LLC acquired Slate in 2011, and then acquired Bartor in 2012.  Auxilium acquired Actient in April 2013.  Auxilium is currently the sole supplier of Testopel.

17.    Defendant John Doe Manufacturer Defendants are defendants who are or have been involved in the manufacture, distribution, marketing, sale and labeling of testosterone products but are not yet known by Plaintiff(s).

18.    At all times relevant herein, Defendants tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and sold the prescription drugs AndroGel, Testopel, and Depo-Testosterone in interstate commerce and throughout the Pennsylvania. At all times relevant herein, Defendants were registered to do business in the Pennsylvania.

## TESTOSTERONE THERAPY AND ITS SIDE EFFECTS

19.    Hypogonadism is a specific condition of the sex glands that may involve the diminished production or nonproduction of testosterone in males.

20.    Testosterone is a primary androgenic hormone responsible for normal growth, development of the male sex organs, and maintenance of secondary sex characteristics.

21.    The hormone plays a role in sperm production, fat distribution, maintenance of muscle strength and mass, and sex drive.

22.    In men, testosterone levels normally begin a gradual decline after the age of thirty.

23.    The average testosterone levels for most men range from 300 to 1,000 nanograms per deciliter of blood. Testosterone levels can fluctuate greatly depending on many factors, including sleep, time of day, and medication. Resultantly, many men who fall into the hypogonadal range one day will have normal testosterone levels the next.

**AndroGel**

24.     The Food and Drug Administration approved AndroGel 1% on February 28, 2000, and then approved AndroGel 1.62% on April 29, 2011.  After FDA approval, AndroGel was widely advertised and marketed as a safe and effective testosterone replacement therapy.

25.     AndroGel is a hydroalcoholic gel containing testosterone that is applied to the shoulders and upper arms, and enters the body through transdermal absorption.

26.     AndroGel may produce undesirable side effects to patients who use the drug, including, but not limited to, myocardial infarction, stroke, and death.

27.     In some patient populations, AndroGel use may increase the incidence of myocardial infarctions and death by more than 500%.

**Depo-Testosterone**

28.     The Food and Drug Administration approved Depo-Testosterone on July 25, 1979.  After FDA approval, Depo-Testosterone was widely advertised and marketed as a safe and effective testosterone replacement therapy.

29.     Depo-Testosterone is a testosterone injection containing testosterone cypionate and is injected intramuscularly.

30.     Depo-Testosterone may produce undesirable side effects to patients who use the drug, including, but not limited to, myocardial infarction, stroke, and death.

31.     In some patient populations, Depo-Testosterone use may increase the incidence of myocardial infarctions and death by more than 500%.

**Testopel**

32.     The Food and Drug Administration approved Testopel on July 13, 1972.  After FDA approval, Testopel was widely advertised and marketed as a safe and effective testosterone replacement therapy.

33.     Testopel is a testosterone pellet. Testopel pellets are implanted under the skin in the hip area or another fatty area.

34.     Testopel may produce undesirable side effects to patients who use the drug, including, but not limited to, myocardial infarction, stroke, and death.

35.     In some patient populations, Testopel use may increase the incidence of myocardial infarctions and death by more than 500%.

36.     In 2010, a New England Journal of Medicine Study entitled "Adverse Events Associated with Testosterone Administration" was discontinued after an exceedingly high number of men suffered adverse events.

37.     In November 2013, a JAMA study was released entitled "Association of Testosterone Therapy with Mortality, Myocardial Infarction, and Stroke in Men with Low Testosterone Levels," which indicated that testosterone therapy raised the risk of death, heart attack and stroke by approximately 30%.

38.     On January 29, 2014, a study was released in PLOS ONE entitled "Increased Risk of Non-Fatal Myocardial Infarction Following Testosterone Therapy Prescription in Men," which indicated that testosterone use doubled the risk of heart attacks in men over sixty-five years old and men younger than sixty-five with a previous diagnosis of heart disease.

39.     There have been a number of studies concluding that testosterone therapy causes a sudden increase in hematocrit, hemoglobin and estradiol, and associating its use with an increased risk of heart attacks and strokes.

40.     In addition to the above, Defendants' testosterone product has been linked to several severe and life changing medical disorders in the user of the product and in those who come into physical contact with the user or the user's unwashed clothes. Patients taking an

aforementioned testosterone product may experience enlarged prostates and increased serum prostate-specific antigen levels.

41.     Secondary exposure to testosterone can cause side effects in others.  In 2009, the FDA issued a black box warning for testosterone prescriptions, advising patients of reported virilization in children who were secondarily exposed to the gel. Testosterone may also cause physical changes in women exposed to the drug and cause fetal damage with pregnant women who come into secondary contact with testosterone.

42.     Defendants' marketing strategy has been to aggressively market and sell their products by misleading potential users about the prevalence and symptoms of low testosterone and by failing to protect users from serious dangers that Defendants knew or should have known result from use of its products.

43.     Defendants successfully marketed testosterone by undertaking a "disease awareness" marketing campaigns.  These campaigns sought to create a consumer perception that low testosterone is prevalent among U.S. men and that symptoms previously associated with other physical and mental conditions, such as aging, stress, depression, and lethargy were actually attributable to "Low-T."

44.     Defendant coordinated massive advertising campaigns designed to convince men that they suffered from low testosterone. Defendant orchestrated national disease awareness media blitzes that purported to educate male consumers about the signs of low testosterone.  The marketing campaigns included promotional literature placed in healthcare providers' offices and distributed to potential testosterone users, and online media.

45.     The advertisements suggest that various symptoms often associated with other conditions may be caused by low testosterone and encourage men to discuss testosterone

replacement therapy with their doctors if they experienced any of the "symptoms" of low testosterone. These "symptoms" include listlessness, increased body fat, and moodiness—all general symptoms that are often a result of aging, weight gain, or lifestyle, rather than low testosterone.

46.     Defendants' advertising programs sought to create the image and belief by consumers and their physicians that the use of testosterone was a safe method of alleviating their symptoms, had few side effects and would not interfere with their daily lives, despite that Defendants knew or should have known these to be false and without any support from their own studies or widely accepted medical literature.

47.     Defendants purposefully downplayed, understated and outright ignored the health hazards and risks associated with using testosterone.  Defendants deceived potential testosterone users by relaying positive information through the press, including testimonials from retired professional athletes, and manipulating hypogonadism statistics to suggest widespread disease prevalence, while downplaying known adverse and serious health effects.

48.     Defendants concealed material relevant information from potential testosterone users and minimized user and prescriber concern regarding the safety of testosterone replacement therapy.

49.     In particular, Defendants fail to mention any potential cardiac or stroke side effects in their commercials, online and print advertisements, and falsely represent that Defendants adequately tested testosterone for all likely side effects.

50.     As a result of Defendants' advertising and marketing, and representations about their products, men in the United States pervasively seek out prescriptions for testosterone. If Plaintiff in this action had known the risks and dangers associated with testosterone, Plaintiff

would not have taken testosterone and consequently would not have been subject to its serious side effects.

51.     Defendants also sought to convince primary care physicians that low testosterone levels are widely under-diagnosed, and that conditions associated with normal aging could be caused by low testosterone levels.

52.     A study published in the Journal of the American Medical Association ("JAMA") in August 2013 entitled "Trends in Androgen Prescribing in the United States, 2001-2011" indicated that many men who get testosterone prescriptions have no evidence of hypogonadism. For example, one third of men prescribed testosterone had a diagnosis of fatigue, and one quarter of men did not even have their testosterone levels tested before they received a testosterone prescription.

53.     While running disease awareness campaigns, Defendants promoted their testosterone product as an easy to use topical testosterone replacement therapy. Defendants contrast their products' at-home topical application with less convenient prescription testosterone injections, which require frequent doctor visits.

54.     Defendants convinced millions of men to discuss testosterone replacement therapy with their doctors, and consumers and their physicians relied on Defendants' promises of safety.  Although prescription testosterone replacement therapy has been available for years, it was not until Defendants' massive marketing campaign that millions of men, who were never been prescribed testosterone, flocked to their doctors and pharmacies.

55.     What consumers received, however, were not safe drugs, but products that cause life-threatening problems, including strokes, heart attacks, and death.

56.     Defendants successfully created a robust and previously nonexistent market for their drugs. Defendants spent millions of dollars promoting their products.  Defendants also spent millions on their unbranded marketing including commercials and websites recommending that men have regular checkups with their physicians and five regular tests done: tests for cholesterol, blood pressure, blood sugar, prostate-specific antigen, and testosterone.

57.     Defendants' advertising resulted in an exponential increase of sales.  Sales of replacement therapies have more than doubled since 2006, and are expected to triple to $5 billion by 2017, according to forecasts by Global Industry Analysts. Shannon Pettypiece, Are Testosterone Drugs the Next Viagra?, May 10, 2012, Bloomberg Businessweek, available at: http://www.businessweek.com/articles/2012-05-10/are-testosterone-drugs-the-next-viagra.

58.     The Defendants' marketing program sought to create the image and belief by consumers and physicians that low testosterone affected a large number of men in the United States and that the use of testosterone is safe for human use, despite that Defendants knew these to be false and  without any support from their own studies or widely accepted medical literature.

59.     Defendants engaged in aggressive, award-winning direct-to-consumer and physician marketing and advertising campaigns for testosterone. Further, Defendants engaged in an aggressive unbranded "disease awareness" campaign to alert men that they might be suffering from "low T."

## SPECIFIC FACTUAL ALLEGATIONS

60.     Plaintiff Benjamin Lewis Amerson, Jr. ("Plaintiff") was 50 years of age when he was prescribed and began testosterone replacement therapy for symptoms he attributed to low testosterone after viewing Defendants' advertisements. Plaintiff used AndroGel from mid-

August 2009 until January 2010, received injections of Depo-Testosterone from February 2010 until July 2011, and had Testopel implants in August 2011 and February 2012.

61.     Neither Plaintiff, nor his physician, received an adequate warning from Defendants about the risk of persistent and/or permanent injury after discontinuation of treatment.

62.     Plaintiff was healthy prior to taking testosterone. In keeping with his healthy and proactive lifestyle, Plaintiff agreed to initiate testosterone treatment. He relied on claims made by Defendants that testosterone had been clinically shown to safely and effectively raise testosterone levels.

63.     Plaintiff suffered three heart attack on or about April 19, 2012, April 24, 2012 and May 1, 2012.

64.     As a result of Plaintiff's use of AndroGel, Depo-Testosterone, and Testopel, Plaintiff requires ongoing treatment, including without limitation, regular medical monitoring.

## FIRST CAUSE OF ACTION
## STRICT LIABILITY – FAILURE TO WARN

65.     Plaintiff incorporates by reference each and every paragraph of this Complaint as if fully set forth herein and further alleges as follows:

66.     The testosterone products manufactured and/or supplied by Defendants were defective due to inadequate warnings or instructions because Defendants knew or should have known that the products created significant risks of serious bodily harm to consumers, and they failed to adequately warn consumers and/or their health care providers of such risks. The testosterone products manufactured and/or supplied by Defendants were defective due to inadequate post-marketing warnings or instructions because, after Defendants knew or should

have known of the risk of serious bodily harm from the use of testosterone, Defendants failed to provide an adequate warning to consumers and/or their health care providers of the product.

67.     As a direct and proximate result of Plaintiff's reasonably anticipated use of testosterone as manufactured, designed, sold, supplied, marketed and/or introduced into the stream of commerce by Defendants, Plaintiff suffered serious injury, harm, damages, economic and non-economic loss and will continue to suffer such harm, damages and losses in the future.

## SECOND CAUSE OF ACTION
## NEGLIGENCE

68.     Plaintiff incorporates by reference each and every paragraph of this Complaint as if fully set forth herein and further alleges as follows:

69.     At all times herein mentioned, Defendants had a duty to properly manufacture, design, formulate, compound, test, produce, process, assemble, inspect, research, distribute, market, label, package, distribute, prepare for use, sell, prescribe and adequately warn of the risks and dangers of testosterone.

70.     At all times herein mentioned, Defendants negligently and carelessly manufactured, designed, formulated, distributed, compounded, produced, processed, assembled, inspected, distributed, marketed, labeled, packaged, prepared for use and sold testosterone and failed to adequately test and warn of the risks and dangers of testosterone.

71.     Despite the fact that Defendants knew or should have known that testosterone caused unreasonable, dangerous side effects, Defendants continued to market testosterone to consumers, including Plaintiff, when there were safer alternative methods of treating loss of energy, libido erectile dysfunction, depression, loss of muscle mass and other conditions that the testosterone advertising claims are caused by low testosterone.

72.     Defendants knew or should have known that consumers such as Plaintiff would foreseeably suffer injury as a result of Defendants' failure to exercise ordinary care as described above.

73.     As a direct and proximate cause of Defendants' negligence, Plaintiff suffered serious injury, harm, damages, economic and non-economic loss and will continue to suffer such harm, damages and losses in the future.

**THIRD CAUSE OF ACTION**
**BREACH OF IMPLIED WARRANTY**

74.     Plaintiff incorporates by reference each and every paragraph of this Complaint as if fully set forth herein and further alleges as follows:

75.     Prior to the time that the aforementioned products were used by Plaintiff, Defendants impliedly warranted to Plaintiff and Plaintiff's agents and physicians that testosterone was of merchantable quality and safe and fit for the use for which it was intended.

76.     Plaintiff was and is unskilled in the research, design and manufacture of the products and reasonably relied entirely on the skill, judgment and implied warranty of the Defendants in using testosterone.

77.     Testosterone was neither safe for its intended use nor of merchantable quality, as warranted by Defendants, in that testosterone has dangerous propensities and will cause severe injuries to users when used as intended.

78.     As a result of the abovementioned breach of implied warranties by Defendants, Plaintiff suffered serious injury, harm, damages, economic and non-economic loss and will continue to suffer such harm, damages and losses in the future.

## FOURTH CAUSE OF ACTION
## BREACH OF EXPRESS WARRANTY

79.     Plaintiff incorporates by reference each and every paragraph of this Complaint as if fully set forth herein and further alleges as follows:

80.     At all times mentioned, Defendants expressly represented and warranted to Plaintiff and Plaintiff's agents and physicians, by and through statements made by Defendants or their authorized agents or sales representatives, orally and in publications, package inserts and other written materials intended for physicians, medical patients and the general public, that testosterone is safe, effective, fit and proper for its intended use. Plaintiff purchased testosterone relying upon these warranties.

81.     In utilizing testosterone, Plaintiff relied on the skill, judgment, representations, and foregoing express warranties of Defendants. These warranties and representations were false in that testosterone is unsafe and unfit for its intended uses.

82.     As a result of the abovementioned breach of express warranties by Defendants, Plaintiff suffered serious injury, harm, damages, economic and non-economic loss and will continue to suffer such harm, damages and losses in the future.

## FIFTH CAUSE OF ACTION
## FRAUD

83.     Plaintiff incorporates by reference each and every paragraph of this Complaint as if fully set forth herein and further alleges as follows:

84.     Defendants, from the time they first tested, studied, researched, evaluated, endorsed, manufactured, marketed and distributed testosterone, and up to the present, willfully deceived Plaintiff, Plaintiff's physicians and the general public, by concealing from them the true facts concerning testosterone, which the Defendants had a duty to disclose.

85.     At all times herein mentioned, Defendants conducted a sales and marketing campaign to promote the sale of testosterone and willfully deceived Plaintiff, Plaintiff's physicians and the general public as to the benefits, health risks and consequences of using testosterone. Defendants knew of the foregoing, that testosterone is not safe, fit and effective for human consumption, that using testosterone is hazardous to health, and that testosterone has a serious propensity to cause serious injuries to its users including, but not limited to, the injuries Plaintiff suffered.

86.     Defendants concealed and suppressed the true facts concerning testosterone with the intent to defraud Plaintiff, in that Defendants knew that Plaintiff physicians would not prescribe testosterone, and Plaintiff would not have used testosterone, if they were aware of the true facts concerning its dangers.

87.     As a result of Defendants' fraudulent and deceitful conduct, Plaintiff suffered serious injury, harm, damages, economic and non-economic loss and will continue to suffer such harm, damages and losses in the future.

## SIXTH CAUSE OF ACTION
## NEGLIGENT MISREPRESENTATION

88.     Plaintiff incorporates by reference each and every paragraph of this Complaint as if fully set forth herein and further alleges as follows:

89.     From the time testosterone was first tested, studied, researched, evaluated, endorsed, manufactured, marketed and distributed, and up to the present, Defendants made misrepresentations to Plaintiff, Plaintiff's physicians and the general public including, but not limited to, the misrepresentation that testosterone was safe, fit and effective for human consumption.  At all times mentioned, Defendants conducted sales and marketing campaigns to promote the sale of testosterone and willfully deceived Plaintiff, Plaintiff's physicians and the

general public as to the health risks and consequences of the use of the abovementioned products.

90.     The Defendants made the foregoing representation without any reasonable ground for believing them to be true. These representations were made directly by Defendants, by sales representatives and other authorized agents of Defendants, and in publications and other written materials directed to physicians, medical patients and the public.

91.     The representations by the Defendants were in fact false, in that testosterone is not safe, fit and effective for human consumption, using testosterone is hazardous to health, and testosterone has a serious propensity to cause serious injuries to users, including but not limited to the injuries suffered by Plaintiff.

92.     The foregoing representations by Defendants were made with the intention of inducing reliance and the prescription, purchase and use of testosterone.

93.     In reliance of the misrepresentations by the Defendants, Plaintiff was induced to purchase and use testosterone.  If Plaintiff had known of the true facts and the facts concealed by the Defendants, Plaintiff would not have used testosterone. The reliance of Plaintiff upon Defendants' misrepresentations was justified because such misrepresentations were made and conducted by individuals and entities that were in a position to know the true facts.

94.     As a result of the foregoing negligent misrepresentations by Defendants, Plaintiff suffered serious injury, harm, damages, economic and non-economic loss and will continue to suffer such harm, damages and losses in the future.

## SEVENTH CAUSE OF ACTION
## FRAUDULENT CONCEALMENT

95.     Any applicable statutes of limitations have been tolled by the knowing and active concealment and denial of material facts known by each Defendant when it had a duty to

disclose those facts. Each Defendant has kept Plaintiff ignorant of vital information essential to his pursuit of these claims, without any fault or lack of diligence on Plaintiff's part, for the purpose of obtaining delay on Plaintiff's part in filing a complaint on the causes of action. Each Defendants' fraudulent concealment did result in such delay. Plaintiff could not reasonably have discovered these claims until shortly before filing his original complaint.

96.     Each Defendant was under a continuing duty to disclose the true character, quality, and nature of its drug that Plaintiff utilized, but instead concealed them. As a result, each Defendant is estopped from relying on any statute of limitations defense.

## EIGHTH CAUSE OF ACTION
## VIOLATION OF UNFAIR AND DECEPTIVE TRADE PRACTICES ACTS

97.     Plaintiff incorporates by reference each and every paragraph of this Complaint as if fully set forth herein and further alleges as follows:

98.     Defendants have a statutory duty to refrain from unfair or deceptive acts or trade practices in the design, development, manufacture, promotion, and sale of testosterone.

99.     Had the Defendants not engaged in the deceptive conduct described herein, Plaintiff would not have purchased and/or paid for testosterone, and would not have incurred related medical costs. Specifically, Plaintiff, his physician, and Plaintiff's physician's staff were misled by the deceptive conduct described herein.

100.    Defendants' deceptive, unconscionable, and/or fraudulent representations and material omissions to patients, physicians and consumers, including Plaintiff, constituted unfair and deceptive acts and trade practices in violation of the state consumer protection statute listed below.

101.    Defendants engaged in wrongful conduct while at the same time obtaining, under false pretenses, substantial sums of money from Plaintiff for testosterone that they would not have paid had Defendants not engaged in unfair and deceptive conduct.

102.    Plaintiff was injured by the cumulative and indivisible nature of Defendants' conduct. The cumulative effect of Defendants' conduct directed at patients, physicians and consumers was to create a demand for and sell testosterone. Each aspect of Defendants' conduct combined to artificially create sales of testosterone.

103.    The medical community relied upon Defendants' misrepresentations and omissions in determining to use testosterone.

104.    By reason of the unlawful acts engaged in by Defendants, Plaintiff has suffered ascertainable loss and damages.

105.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff was damaged by paying in whole or in part for testosterone.

106.    As a direct and proximate result of Defendants' violations of unfair trade practice acts, Plaintiff has sustained economic losses and other damages for which he is entitled to statutory and compensatory damages, and declaratory relief, in an amount to be proven at trial.

## NINTH CAUSE OF ACTION
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

107.    Plaintiff incorporates by reference each and every paragraph of this Complaint as if fully set forth herein and further alleges as follows:

108.    Defendants carelessly and negligently manufactured, marketed, and sold testosterone to Plaintiff, carelessly and negligently concealed defects from Plaintiff, and carelessly and negligently misrepresented the quality and safety of testosterone. Defendants

should have realized that such conduct involved an unreasonable risk of causing emotional distress to reasonable persons, that might, in turn, result in illness or bodily harm.

109.    Defendants owed a duty to treating physicians and Plaintiff to accurately and truthfully represent the risks of testosterone. Defendants breached that duty by misrepresenting and/or failing to adequately warn of the risks of testosterone – effects of which Defendants knew or in the exercise of diligence should have known – to the treating physicians and Plaintiffs.

110.    As a direct and proximate result of Defendants' wrongful conduct and breach of duty, Plaintiff has sustained and will continue to sustain severe emotional distress either due to physical injury or a rational fear of physical injury and is entitled to recovery of damages in an amount to be proven at trial.

**TENTH CAUSE OF ACTION
LOSS OF CONSORTIUM/PER QUOD CLAIM**

111.    Plaintiff incorporates by reference each and every paragraph of this Complaint as if fully set forth herein and further alleges as follows:

112.    By reason of the foregoing, Plaintiff's spouse has necessarily paid and has become liable to pay for medical aid, treatment, attendance and medications, and will necessarily incur further expenses of a similar nature in the future.

113.    By reason of the foregoing, Plaintiff's spouse has been caused presently and in the future the loss of her husband's companionship, services and society.

**WHEREFORE,** Plaintiff prays for relief against Defendants, jointly and severally, as follows:

1.    Compensatory damages, in excess of the amount required for federal diversity jurisdiction, and in an amount to fully compensate Plaintiff for all of his injuries and damages, both past and present;

2.      Special damages, in excess of the amount required for federal diversity jurisdiction and in an amount to fully compensate Plaintiff for all of his injuries and damages, both past and present, including but not limited to, past and future medical expenses, costs for past and future rehabilitation and/or home health care, lost income, permanent disability, including permanent instability and loss of balance, and pain and suffering.

3.      Punitive and/or exemplary damages for the wanton, willful, fraudulent, reckless acts of Defendant who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to Plaintiff in an amount sufficient to punish Defendant and deter future similar conduct

4.      Double or triple damages as allowed by law;

5.      Attorneys' fees, expenses, and costs of this action;

6.      Pre-judgment and post-judgment interest in the maximum amount allowed by law; and

7.      Such further relief as this Court deems necessary, just, and proper.

### JURY DEMAND

Plaintiff demands a trial by jury of all claims asserted in this Complaint.

Dated: April 15, 2014

Respectfully submitted,

W. Mark Lanier
Rick Meadow
Catherine Heacox
THE LANIER LAW FIRM, PLLC
126 East 56th Street, 6th Floor
New York, NY 10022
Phone: (212) 421-2800
Fax:  (212) 421-2878
catherine.heacox@lanierlawfirm.com

*Counsel for Plaintiffs*